UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

                v.                      12-CR-0157A(Sr)

**ALEJANDRO NAVARRO-GONZALEZ,**

      **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #5.

## PRELIMINARY STATEMENT

The defendant, Alejandro Navarro-Gonzalez ("the defendant"), is charged in a one-count indictment with possession with intent to distribute heroin in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2. Dkt. # 1. The defendant also faces a forfeiture allegation. *Id*. Defendant Navarro-Gonzalez has filed a motion to suppress evidence seized during a consent search of a storage unit, as well as to suppress statements he made to law enforcement following his arrest. Dkt. #15. In an affidavit filed in support of his motion to suppress, defendant Navarro-Gonzalez stated that he twice asked for a lawyer, that law enforcement told him that he and his girlfriend were going to be charged with possession of the 15 kilograms of drugs found in the car and that he felt "coerced by

the agents when I signed the paper they gave me." Dkt. #15. The government filed a response to the defendant's motion to suppress wherein it asserts that *Miranda* warnings were timely administered to the defendant, that during the post-*Miranda* interview, the defendant made various admissions and ultimately consented to a search of the storage unit he had rented. Dkt. #16. An evidentiary hearing was held by this Court on November 29, 2012 and the government called United States Drug Enforcement Administration ("DEA") Special Agent Jonathan R. Sullivan as its only witness. The defendant did not present any direct evidence during the evidentiary hearing. A transcript of the proceeding was filed on December 17, 2012. Dkt. #18. Thereafter, post-hearing memoranda were filed by the defendant (Dkt. #19) and the government (Dkt. #20) on January 16, 2013.

## **FACTS**[1]

Special Agent Sullivan testified that in March 2012, a vehicle was stopped by the Ohio State Police. T, p.14. The individuals arrested during that traffic stop provided information that indicated that the defendant, Alejandro Navarro-Gonzalez, was the intended recipient of the drugs which were found in the vehicle. T, p.14. Following the traffic stop in Ohio, one of the individuals was left in Ohio and the other was brought back to Buffalo for purposes of coordinating a controlled delivery of the

---

[1] The facts herein are taken from the testimony and exhibits admitted into evidence during the proceedings held on November 29, 2012. References to those proceedings will be designated as T, followed by the appropriate page number(s) or Government Exhibit followed by the exhibit number.

drugs to defendant Navarro-Gonzalez. T, p.15. The controlled delivery took place on March 14, 2012 at the Fairfield Inn on Genesee Street in Cheektowaga.[2] T, p.15. Special Agent Sullivan testified that he was present at the controlled delivery and that members of his group took defendant Navarro-Gonzalez into custody. T, p.15.

Thereafter, Special Agent Sullivan testified that he, in the presence of Cheektowaga Police Department Detective Timothy Donovan and Officer Eric Broska (also referred to herein as Task Force Officers Donovan and Broska), "encountered" the defendant at the Buffalo Resident Office of the DEA. T, pp.15-16. Special Agent Sullivan testified that the first thing he did when he encountered the defendant was to read him his *Miranda* warnings, "off the card." T, p.16. Special Agent Sullivan testified that in addition to English, he also speaks Spanish and that he "believe[d] I read them [*Miranda* warnings] in Spanish language" to the defendant. T, p.16. At the time Special Agent Sullivan was administering *Miranda* warnings to the defendant, the defendant did not say that he did not understand nor did he request to speak to an attorney. T, p.17. Indeed, after he administered the *Miranda* warnings to the defendant, Special Agent Sullivan testified that he asked the defendant whether he understood the warnings and the defendant indicated that he did and that he was willing to speak with Special Agent Sullivan and the other agents. T, p.19. Special Agent Sullivan, did, however, testify that, "there were occasions where we had a minor language barrier. The questioning

---

[2] According to the transcript of the evidentiary hearing, Special Agent Sullivan erroneously testified that the controlled delivery took place on March 15, 2012. However, all of the other documentary evidence in the record indicates that the controlled delivery took place on March 14, 2012.

was done in English, for the most part. When we encountered a language barrier, I would rephrase it in Spanish, and ensure that we understood each other." T, p.18.

With respect to the conduct of the interview itself, Special Agent Sullivan testified that it took place in an interview room at the DEA Buffalo Resident Office and that in addition to himself, he believed that Task Force Officers Donovan and Broska were also present in the interview room. T, p.37. Special Agent Sullivan testified that he could not recall if the defendant was handcuffed during the interview, but that the defendant had previously been handcuffed, and that occasionally, they take the handcuffs off during the interview process. T, p.37. During the interview, the defendant was seated and Special Agent Sullivan testified that at all times, his firearm was holstered and was not displayed and further, that at no time did he threaten or coerce the defendant or hear the other officers threaten or do anything to coerce the defendant. T, pp.37-38. Finally, Special Agent Sullivan testified unequivocally that from the time he first encountered the defendant on March 14, 2012 until the time he made his initial appearance on the Criminal Complaint on March 15, 2012, at no time did he request to speak to an attorney. T, p.39.

Special Agent Sullivan testified that in response to his questioning, defendant Navarro-Gonzalez stated that he was meeting the other individual to pick up a letter and that he had no knowledge of any drugs in the vehicle or why he had been arrested. T, pp.19-20. During the course of the investigation, Special Agent Sullivan testified that law enforcement had received information concerning a storage unit at a

public storage facility in Williamsville, New York. T, p.20. Special Agent Sullivan testified that in response to his questions, defendant Navarro-Gonzalez acknowledged that he had rented a storage unit at the request of his brother.[3] T, pp.20-21. Thereafter, Special Agent Sullivan testified that he asked defendant Navarro-Gonzalez for consent to search the storage unit and defendant Navarro-Gonzalez executed a written Consent to Search form. T, pp.22-24 and Government Exhibit 1. At no time while Special Agent Sullivan was reviewing the Consent to Search form, did defendant Navarro-Gonzalez have any questions or ask to speak to an attorney. T, pp.22-23.

Special Agent Sullivan testified that after he hand wrote the description of the place to be searched, *to wit*: the storage unit, he handed the form to defendant Navarro-Gonzalez, asked him to read each line, he then reviewed each line with the defendant and asked the defendant to initial next to each line to show that he had in fact reviewed it. T, p.22. Section 1 of the Consent to Search form sets forth the information concerning the location of the storage unit rented by defendant Navarro-Gonzalez on March 8, 2012. Government Exhibit 1. Section 2 of the Consent to Search form states, "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY"

---

[3] Special Agent Sullivan testified that on March 6, 2012, two days before defendant Navarro-Gonzalez rented the storage unit, a search warrant was executed at 39 Montclair in Buffalo, which was the residence of Pascual Giovanny Navarro-Gonzalez, one of the defendant's brothers. T, pp.32-34. As part of an ongoing criminal investigation involving Pascual Giovanny Navarro-Gonzalez, law enforcement obtained a federal search warrant for a package destined for 39 Montclair. That package was found to contain 500 grams of cocaine. Thereafter, heroin, marijuana, ammunition, Dormin (a sleep aid used as a cutting agent), packaging materials and other drug paraphernalia were seized following the execution of the search warrant at 39 Montclair. T, pp.32-33.

and Section 3 states, "I FREELY CONSENT TO THIS SEARCH." *Id*. After reviewing each line, defendant Navarro-Gonzalez initialed each section and signed the form and his signature was witnessed by Special Agent Sullivan and Task Force Officer Broska. T, pp.23-24. The Consent to Search form was dated March 14, 2012. T, p.24.

Special Agent Sullivan testified that after defendant Navarro-Gonzalez was transported to the Erie County jail, law enforcement officers executed the consent search at the storage unit. T, p.25. Special Agent Sullivan further testified, "[w]e found approximately 1.7 kilograms of heroin, we found a Kel-Tech .32 caliber semiautomatic handgun. I believe we found ammunition. We found Dormin which is a sleep aid which is frequently used as a cutting agent for heroin. We found a heroin press, which is used to re-brick heroin. And a few shopping bags." T, p.25. Further investigation and a copy of the lease documents received from the storage facility pursuant to an administrative subpoena confirmed the defendant Navarro-Gonzalez rented the storage unit just two days after a search was conducted at the defendant's brother's residence at 39 Montclair. T, pp.30-32.

According to Special Agent Sullivan's testimony, it was subsequently determined that the information supplied by those arrested in Ohio concerning the identity of the intended recipient of the heroin was inaccurate. T, p.54. In addition, the testimony at the hearing was that defendant Navarro-Gonzalez consistently denied any knowledge of the drugs in the car. *Id*. Accordingly, defendant Navarro-Gonzalez was only charged with what was seized from the storage facility. *Id*.

## **DISCUSSION AND ANALYSIS**

In his affidavit submitted in support of his motion to suppress, the defendant asserts that he twice asked for a lawyer. Dkt. #15, ¶¶ 7 and 9. Specifically, the defendant stated that he was taken to the DEA office and was placed in a cell and after an hour, the agents began to interrogate him. At that time, he claims he asked for a lawyer. *Id*. at ¶ 7. Again in the same affidavit, the defendant states that one of the agents told him that 15 kilograms of heroin was found in the car and that he and his girlfriend were going to be charged with the 15 kilograms, "I again asked for a lawyer." *Id*. at ¶ 9. In addition, the defendant claimed that he "felt coerced by the agents when I signed the paper they gave me." *Id*. at ¶ 10.

Although not his principal argument in support of suppression, defendant Navarro-Gonzalez claims that he twice asked for a lawyer while he was in DEA custody. *See* Dkt. #15, pp.5-6. This argument, presented solely in the defendant's affidavit and not in any post-hearing submission, is belied by Special Agent Sullivan's unequivocal and uncontradicted testimony at the hearing. Special Agent Sullivan testified that at no time did defendant Navarro-Gonzalez ask for a lawyer. The defendant did not present any witnesses or testimony at the evidentiary hearing conducted by this Court on November 29, 2012.

With respect to the issue of giving *Miranda* warnings to the defendant prior to interrogating him, the testimony of Special Agent Sullivan is also

uncontradicted. Special Agent Sullivan testified that he read the defendant his *Miranda* warnings "off the card" and testified that he believes he read them to the defendant in Spanish. Indeed, Special Agent Sullivan testified that after he administered *Miranda* warnings to the defendant, he asked the defendant whether he understood the warnings and the defendant indicated that he did and that he was willing to speak with Special Agent Sullivan and the other agents. T, p.19. Moreover, Special Agent Sullivan further testified that, "there were occasions where we had a minor language barrier. The questioning was done in English, for the most part. When we encountered a language barrier, I would rephrase it in Spanish, and ensure that we understood each other." T, p.18. Lastly, Special Agent Sullivan testified that at no time did defendant Navarro-Gonzalez request to speak to an attorney. T, p.39.

I observed the demeanor of Special Agent Sullivan and heard his unequivocal and uncontradicted testimony and have found him to be credible. As a result, I find that the defendant was properly warned and advised of his rights in accordance with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). I further find that the defendant understood his rights and voluntarily agreed to speak with the law enforcement agents. Finally, I find that there is nothing in the record to support defendant Navarro-Gonzalez's assertion that his requests for a lawyer were ignored and that his right to counsel was violated.

Turning now to defendant Navarro-Gonzalez's argument that he was coerced during his interrogation, based on the testimony presented during the

evidentiary hearing and considering the totality of the circumstances, this Court has already found that *Miranda* warnings were timely administered to the defendant, the defendant understood his rights, and voluntarily, knowingly and intelligently waived those rights.  The Court further funds that there is no evidence to support defendant Navarro-Gonzalez's assertion that he was coerced to give statements or to consent to the search of the storage unit.  Accordingly, for the reasons discussed below, this Court recommends that defendant's motion to suppress his statements and the evidence seized from the storage unit be denied in its entirety.

By his motion, defendant Navarro-Gonzalez seeks to suppress his post-arrest statements made to law enforcement, as well as to suppress the evidence found in the storage unit for which he had given his written consent to search.  Dkt. #15.  The only real issue that needs be addressed in order to resolve the defendant's motion to suppress is that of the credibility of the sole witness who testified at the evidentiary hearing, Special Agent Sullivan.  There is no dispute, Special Agent Sullivan unequivocally testified that he gave *Miranda* warnings to the defendant before he commenced any custodial interrogation of the defendant by reading same "right off the card."  T, p.16. Although "the card" referenced in Special Agent Sullivan's testimony was not offered as an exhibit during the hearing, based on my judicial experience, I understand "the card" to mean a card with the *Miranda* warnings printed on it that is often carried by law enforcement personnel from which, in this case, *Miranda* warnings were read to defendant Navarro-Gonzalez.  Moreover, Special Agent Sullivan testified that he believed he read the defendant his *Miranda* warnings in Spanish and that at any

time during the interrogation if there was any hint of a language barrier he would rephrase the question in Spanish and ensure that they understood each other.

"[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson,* 423 U.S. 411, 424 (1976); *United States v.* Garcia, 56 F.3d 418, 423 (2d Cir. 1995).

> [W]hether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine quo non* of an effective consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995). In support of his motion, defendant Navarro-Gonzalez asserts that the factors to be considered in determining whether coercion was present are the length of time of interrogation, language difficulties, concern for his girlfriend and the prospect of being charged with a crime that he did not commit. Dkt. #19, p.3. First, defendant Navarro-Gonzalez addresses what he characterizes as the ambiguous testimony of Special Agent Sullivan concerning the language used during the interrogation. *Id*. at pp.3-4. Specifically, defendant Navarro-Gonzalez states that Special Agent Sullivan testified at the hearing that,

> [h]e "believed" the <u>Miranda</u> warnings were in Spanish, he was aware of a minor language barrier, he believed [sic] consent form was read to the defendant, believed it was done in English, believed he asked Mr. Navarro-Gonzalez if he was threatened, believed I [sic] read the form to him, possibly I [sic] put the form in front of him and had him initial

> it. The Court is to consider the equivocal nature of his
> responses in determining if language was in fact a more
> important factor than Agent Sullivan has led us to believe.

*Id*. at pp.3-4. Defendant Navarro-Gonzalez next argues that the fact that he believed he was about to be wrongfully accused of a crime of possession drugs seized in Ohio is a factor that favors a finding of coercion. *Id*. at p.4. In addition, defendant Navarro-Gonzalez was told that his girlfriend could also be charged. Defendant Navarro-Gonzalez further asserts that,

> [f]or three and a half hours, under interrogation, he denied
> being involved with Vasquez or having any knowledge of the
> seizures in Ohio and he was correct. The usual scenario is
> that the person detained knows what role he played in the
> underlying criminal activity. Getting arrested for something
> you did is an inherent risk to a criminal. Threats of arrest
> are expected. Not so for an innocent person. To be
> arrested for a crime one did not commit is coercive in and of
> itself.

*Id*.

As discussed above, Special Agent Sullivan testified unequivocally that if at any time during the interrogation it appeared that there was a language barrier, he would rephrase the question in Spanish and ensure that the defendant understood. With respect to the issue of coercion, Special Agent Sullivan testified that at all times his weapon was holstered and further, that at no time did he threaten or coerce the defendant nor did he hear the other officers threaten or do anything to coerce the defendant. T, pp.37-38. Finally, the Consent to Search form executed by the defendant states in bold letters, "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY. I FREELY CONSENT TO THIS SEARCH." Government Exhibit 1. The

defendant initialed each line on the Consent to Search form, including the two sentences above, and then signed the form. *Id*.

Without more, defendant Navarro-Gonzalez's statements concerning the length of the interrogation, an alleged language barrier, and a belief that he and his girlfriend could have been charged with possession of the drugs seized in Ohio, the record is insufficient and devoid of any facts to support the conclusion that the defendant was in any way coerced. There is nothing in the uncontradicted testimony of Special Agent Sullivan to suggest that the defendant did not understand the Consent to Search form or the questions posed to him or that he asked for an attorney. Moreover, absent his coercion argument, defendant Navarro-Gonzalez offers nothing else to challenge the verbal and written consent given to search the storage unit he rented. Accordingly, based on the totality of the circumstances, as well as my observations of the demeanor of Special Agent Sullivan and my determination that I found Special Agent Sullivan to be credible, I find that defendant Navarro-Gonzalez made a rational, reasoned and voluntary decision to permit the agents to enter, search and remove evidence from inside the storage unit that he rented. Therefore, it is recommended that defendant's motion to suppress his statements and the evidence seized from the storage unit be denied in its entirety.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**


DATED:   Buffalo, New York
         February 8, 2013

                                        *s/ H. Kenneth Schroeder, Jr.*
                                        **H. KENNETH SCHROEDER, JR.
                                        United States Magistrate Judge**